IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RASHAD C. LEE,  #213823,          *
                                  *
     Plaintiff,                   *
                                  *
vs.                               *  CIVIL ACTION NO. 16-0625-CG-B
                                  *
KENNETH PETERSON, *et al.,*        *
                                  *
     Defendants.                  *

## REPORT AND RECOMMENDATION

Plaintiff Rashad C. Lee, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983.  This action has been referred to the undersigned for appropriate action pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R).  After careful review, it is recommended that the parties' motions for summary judgment (Docs. 64, 143, 150) be **DENIED**.

**I.   Background and Summary of Complaint.**[1]

Plaintiff Lee brings this action against Warden Kenneth Peters, Captain Kevin Bishop, Captain Willie Knight, and Ms. Sandra Hinds[2] for their alleged deliberate indifference, in failing to

---

[1] "[T]he 'facts' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000).

[2] In naming Sandra Hinds as a defendant in this action, Plaintiff

protect him from an inmate attack on October 27, 2016, in violation of the Eighth Amendment.[3]

It is undisputed that, on October 27, 2016, at approximately 3:00 a.m., Lee was attacked by inmates Bobby White and Randy Pritchard while incarcerated at Fountain Correctional Center.[4] (Doc. 46-5). Lee suffered punctures in the forehead, shoulder, top of head, and lips and cheeks and was transported via ambulance to the local hospital, where he received sutures for his wounds and an MRI to confirm no internal bleeding. (Docs. 46-5; 46-7). Lee returned to Fountain prison the same day, and inmates Randy Pritchard and Bobby White were subsequently charged with assault on an inmate, placed into the segregation unit, and validated as

---

Lee incorrectly spells the Classification Specialist's last name as "Haynes". (Doc. 20 at 8). Based on Defendants' pleadings however, it is apparent that this Defendant's correct name is "Sandra Hinds," and that is the name the Court will use in the instant report. (See Docs. 46 at 3 n.2, 46-4).

[3] Plaintiff Lee has limited this lawsuit to the October 27, 2016 assault, despite articulating facts related to a potential retaliation claim in his amended complaint. (Docs. 9, 11, 20). Lee specifically states in his deposition, "We're just here on the assault" (Doc. 144-1 at 25), and his subsequent pleadings, including his motions for summary judgment, relate solely to the failure to protect claim and do not assert additional constitutional or state claims directed at any defendant. (See Docs. 64, 150, 157). Accordingly, this action and motion(s) pertains solely to establishing whether or not Defendants acted in violation of the Eighth Amendment by failing to protect Lee from the October 27, 2016, inmate attack.

[4] The record indicates that Inmate White held Lee down so that inmate Pritchard could stab him. (Docs. 46-5; 46-8).

enemies of Lee.  (Docs. 46 at 6; 46-5; 46-8; 20 at 11).

According to Lee, he notified Defendants numerous times prior to the attack that he was in danger of being assaulted.  Lee claims that, within days of arriving at Fountain Correctional Center (hereinafter "Fountain" or "the prison"), in December of 2015,[5] he recognized an inmate who previously attacked him at Elmore Correctional Facility ("Elmore").  (Doc. 144-1 at 2-3).  Lee did not know the inmate's official name but knew him to be from the Birmingham, Alabama area and to go by the alias "Pooh Man."[6]  (Id. at 3).  Lee alleges he notified Warden Peters, Warden Streeter, Warden Stewart, Ms. Hines, and Ms. Nichols of his prior history with Pooh Man, specifically that Pooh Man and some of his friends assaulted and robbed him at Elmore, but the "[officials] kept brushing it off."[7]  Lee further alleges he provided Defendants with Pooh Man's assigned bed number so that it could be cross referenced

---

[5] Lee was convicted of murdering his wife in 2000 and is currently serving a life sentence in the custody of the Alabama Department of Corrections.  (Doc. 20 at 6).  Lee was transferred from Easterling Correctional Facility to Fountain Correctional Center in February 2015.  (Doc. 144-1 at 2).

[6] In his deposition, Lee states that Pooh Man was a gang member of the Bloods from Birmingham, Alabama.  (Doc. 144-1 at 4, 6).

[7] Lee claims that Warden Stewart and Ms. Hinds stated that they "investigated it" but "didn't find anything."  (Doc. 144-1 at 6). He opines that the prison officials thought that he "was just trying to get transferred."  (Id. at 4).

in the prison's computer system to reveal Pooh Man's legal name.[8] (Doc. 144-1 at 98-99). However, Lee claims this was never done. Lee also claims his requests to be transferred were denied and prison officials told him, "no institutions wanted [him] because [he] filed on the administration everywhere [he] went therefore whatever bed [he'd] made be a man and lay in it." (Id. at 3-6; Doc. 20 at 8-9).

According to Lee, Pooh Man was transferred to another facility about three or four months after Lee complained about him; however, during the period that Pooh Man was still at Fountain, Pooh Man "hung out" with other Birmingham, Alabama inmates who resided in his dorm, and these inmates started to threaten Lee "[a]bout what they were going to do to [him], this, that and the other", including stabbing him and exploiting him for money. (Doc. 144-1 at 9-11; 144-1 at 24-25.)[9]. Lee estimates that they directed these threats at him on at least twenty occasions prior to the stabbing. (Doc. 144-1 at 14).

---

[8] Lee testified in his deposition that he was one hundred percent certain that he provided the right bed number for Pooh Man because he went to Pooh Man's dorm and asked a couple of guys he knew, "hey, this guy from Birmingham, Pooh Man, what bed is he assigned to in here?  And they told [him].  [He] wrote it down and took it to [Ms. Hinds]."  (Doc. 144-1 at 23).

[9] It is undisputed that Pooh Man did not personally participate in the attack (as he was transferred to another facility three or four months after Lee arrived at Fountain).

Lee contends that approximately six (6) inmates participated in the October 27, 2016 attack, but he could only identify two of the assailants, Bobby White and Randy Pritchard. (Doc. 20 at 11). He also contends that he had identified Bobby White as one of the individuals threatening him prior to the October 27th attack because he knew him from a previous prison. According to Lee, Inmates White and Pritchard attacked him (beating and stabbing him), while the other inmates stole his personal property from his locker. (Id.). After receiving medical treatment, Lee was placed in the segregation unit for six weeks before being released back to the same dormitory, where the unidentified inmate participants were still housed.[10] (Id.).

Plaintiff Lee seeks compensatory and punitive damages in the amount of $50,000.00, an order for the Alabama Department of Corrections to hire more officers, and an order mandating that an officer be assigned to every dormitory in every prison facility. (Doc. 20 at 7).

Defendants answered the suit and filed special reports in support of their denial of the allegations against them. (Docs. 46, 47). Plaintiff Lee responded (in multiple pleadings) to Defendants' special report, was granted the opportunity for further discovery (Docs. 100, 102, 103, 108, 126, 127), and filed

---

[10] Lee is no longer incarcerated at Fountain, as he was transferred to another correctional facility in April of 2017. (Doc. 21).

an initial motion for summary judgment (Docs. 64; 83). On September 13, 2019, Defendants Bishop, Knight, Hinds, and Peters moved for summary judgment (Docs. 143, 144), and Plaintiff Lee responded to the same. (Docs. 146, 148, 151, 153, 154). Plaintiff Lee subsequently filed another motion for summary judgment on September 20, 2019. (Docs. 150, 157). The parties' cross motions for summary judgment are now before the court for review.

**II.  Summary Judgment Standard.**

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'" (emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

_Celotex_, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. _Id._ at 322-24.

> Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" _Id._ at 324. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. _See Anderson_, 477 U.S. at 255.

_ThyssenKrupp Steel USA, LLC v. United Forming, Inc._, 926 F. Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations omitted).

The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to material facts." _Garczynski_, 573 F.3d at 1165 (internal citations omitted). A "mere scintilla" of evidence is insufficient; the nonmoving party must produce substantial evidence in order to defeat a motion for summary judgment. _Id._ In addition, "[t]here is no burden upon the district court to distill every potential

argument that could be made based upon the materials before it on summary judgment." Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).  More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Logan v. Smith, 439 Fed. Appx. 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events, one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).

## III. Discussion.

### a. Official Capacity Claims.

The defendants named in this action are all correctional officers employed by the Alabama Department of Corrections.  To the extent Plaintiff has sued each defendant in his or her official capacity, the defendants are immune from suit. "Official-capacity suits ... generally represent only another way of pleading an action against an entity of which an officer is an agent." Penley v. Eslinger, 605 F.3d 843, 854 (11th Cir. 2010) (citation omitted); see also Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1309 (11th Cir.

2009) ("A claim asserted against an individual in his or her official capacity is, in reality, a suit against the entity that employs the individual.") (citation omitted).  As a practical matter, then, Plaintiff's § 1983 claims against Defendants in their official capacities functionally reduce to § 1983 claims against the State itself.

The Eleventh Amendment protects Defendants in their official capacities from Lee's claims. See, e.g., Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984) (With some exceptions, "a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment.  This jurisdictional bar applies regardless of the nature of the relief sought." (citations omitted)); Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1277 (11th Cir. 1998) ("[S]tate officials sued in their official capacity are []protected by the [Eleventh A]mendment." (citing Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)).  In addition, "a state agency[] and a state official sued in his official capacity are not 'persons' within the meaning of § 1983, thus damages are unavailable...." Edwards v. Wallace Cnty. Coll., 49 F.3d 1517, 1524 (11th Cir. 1995) (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L.

Ed. 2d 45 (1989)).  Thus, Defendants, in their official capacities, are immune from suit for monetary damages.[11]

**b. Eighth Amendment Failure to Protect.**

"The Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." Caldwell v. Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)) (alterations and quotations omitted).  The Eleventh Circuit has "stress[ed] [however]that a 'prison custodian is not the guarantor of a prisoner's safety.'" Purcell ex rel. Estate of Morgan v. Toombs Cnty., Ga., 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting Popham v. City of Talladega, 908 F.2d 1561, 1564 (11th Cir. 1990)). In other words "[i]t is not

---

[11] While Defendants are not absolutely immune from suit in their individual capacities, Defendants have asserted the defense of qualified immunity, which "protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Dalrymple v. Reno, 334 F. 3d 991, 994 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)).  The Supreme Court has established a two-prong test for evaluating a claim of qualified immunity: (1) whether a constitutional right has been violated based on the facts alleged; and (2) whether the right was "clearly established." Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001).

As discussed in this report, there remain questions of fact as to whether or not Defendants have violated Plaintiff Lee's Eighth Amendment right in failing to protect him from the inmate attack on October 27, 2016.  Accordingly, it is premature to evaluate the availability of qualified immunity to the defendants.

. . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834; Purcell v. Toombs Cnty., 400 F.3d 1313, 1321 (11th Cir. 2005) ("[A] prison custodian is not the guarantor of a prisoner's safety.") (quotation omitted). A prison official violates the Eighth Amendment when he or she acts with deliberate indifference to a substantial risk of serious harm to an inmate. Farmer, 511 U.S. at 828.

> In this context, deliberate indifference requires: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence. [Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010)]; see also Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004) ("Deliberate indifference is not the same thing as negligence or carelessness."). Thus, a prison official may have subjective knowledge only if he had both knowledge of specific facts from which an inference of risk of serious harm could be drawn, and he actually drew that inference. Carter[ v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)]. And, therefore, a plaintiff's claim will fail as a matter of law in the absence of actual knowledge of the substantial risk, because to hold otherwise would impermissibly vitiate the subjective component of the analysis. See Farmer, 511 U.S. at 837-38.

Estate of Owens v. GEO Grp., Inc., 660 Fed. Appx. 763, 767 (11th Cir. 2016).

Accordingly, to survive summary judgment, Lee must demonstrate an objectively serious risk of harm, Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014); see also, Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (The Eighth Amendment

is violated only where there is "'a strong likelihood, rather than a mere possibility,'" of a risk of injury)(citation omitted), and he must further show that Defendants were aware of the risk of harm.  See McBride v. Rivers, 170 Fed. Appx. 648, 654 (11th Cir. 2006) (To establish deliberate indifference, a plaintiff must show that the defendants were "'aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists–and the [defendant] must also draw that inference.'") (quoting Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not," is not sufficient to establish liability on the part of the official.  Farmer, 511 U.S. at 838. "Merely negligent failure to protect an inmate from attack does not justify liability under § 1983." Brown, 894 F.3d at 1537.

In analyzing whether or not Defendants were deliberately indifferent to a known and substantial risk of serious harm to Lee, the undersigned begins with Lee's allegation that he notified Defendants on numerous occasions, both verbally and through written requests, that he was in danger of being attacked.  Lee maintains he personally asked his classification officer, Defendant Sandra Hinds, (several times) to transfer him or place him in lockup because there were two inmates in the facility that had previously robbed and assaulted him in Elmore; Lee further insisted that disciplinaries should be available in their files

from the Elmore assault.   (Doc. 20 at 9).   Lee subsequently notified Defendant Captains Bishop and Knight of the same and claims both ignored his pleas for a transfer or lockup request. (Id.).   Lee asserts that he then complained to Defendant Warden Peters that he "was gonna kill [him]self to try get away from these guys because [he] knew how dangerous they were."   (Id.).   Lee alleges that on the night he was attacked, he notified Captains Bishop and Knight that he "wasn't comfortable being in the Dorm with the inmates that had assaulted [him] at Elmore and robbed [him] . . .", and he was again refused a transfer to another dorm and was told "to get a knife everybody else got one."  (Doc. 20 at 10).   Lee further alleges that when he returned to J-Dorm after the attack, he feared retaliation and requested that Captains Knight and Bishop move him out of the unit, but he was told, "get out of the office [and] go back down the hall and let them guys finish what the other ones started."   (Id. at 12).

In response to Lee's claims, Defendants deny having knowledge of a substantial risk of serious harm and argue that Lee has failed to establish deliberate indifference for two main reasons: (1) Lee never identified Inmates White or Pritchard as inmates he feared, nor did he attempt to add them to his enemy list prior to October 27, 2016, and (2) Lee's relayed threats were insufficient to put them on notice of a substantial risk of harm. (Docs. 46-1; 46-2; 46-3; 46-4; 144 at 11-12).

**1. Subjective knowledge of Substantial Risk of Serious Harm.**

The record reflects that Lee began to communicate threats of harming others in December 2015 and was evaluated by the mental health staff at Fountain. (See Docs. 76-1 at 22, 24, 30-31). Lee first reported to the mental health staff on December 30, 2015:

> I can't be down here (FCC) due to having an enemy here (Pooh Man). I had problems with several officers the last time I was here. I told Ms. Hinds about this and she is looking into it. The guy robbed me and put a knife to my neck. I threaten to hurt myself and other people to get some help.

(Doc. 76-1 at 31). Lee retracted his threats of harming others the same day when confronted with possible segregation placement and explained that he was trying to get a transfer to be closer to his family and children. (Id.). The mental health notes further indicate that "no validated enemy [was] found," and Warden Streeter was notified and investigated issues. (Id. at 30).

On January 10, 2016, Lee next communicated thoughts of harm in a letter penned to Warden Culliver, stating that he was having thoughts of suicide if he could not be transferred closer to his family. (Id. at 4-10, 28). Then, again, on January 12, 2016, through an Inmate Request Slip, Lee claimed to be hearing voices and requested a transfer to be closer to family. (Id. at 28). Thereafter, on January 13, 2016, Lee was admitted for mental health observation for symptoms of "paranoia and delusional thinking," namely that "ADOC officials are out to get him" and that "he needs

to be away from Fountain inmate."[12]   (Doc. 76-1 at 2).

Lee further submitted the following Inmate Request Slips communicating his desire to be transferred from Fountain or moved from J-Dorm:

January 16, 2016, stating:

Ms. Hinds I have a enemy in the camp from Elmore!!! I don't know his real name but he goes by "Pooh Man" Captain Smiley @ Elmore transferred him cause he robbed and assaulted me there and now we are both here!  I'm getting me a knife these young guys on drugs are dangerous please separate us! ASAP!

(Doc. 64 at 31) (alterations in capitalization).

February 11, 2016, stating:

Ms. Hinds I just got out of a one man suicide cell trying to get someone to listen to me about two inmates that are here that robbed and assaulted me @ Elmore.  Do I have to hurt myself, or one of them for yall to do yalls job and try to separate us?  You won't even answer my requests!!!!  Why!!!

(Doc. 64 at 28).

April 6, 2016, stating:

Ms. Hinds next month I'm [up for] custody review. I'm eligible per ADOC Classification Manual so please transfer me from here because I told you I have enemies here and you won't see me or write me back!  Do we have to kill each other before you move one of us?  I hope not so do your job investigate and separate u!  Get me out [] camp with these dudes please

---

[12] The mental health records confirm that Lee admitted to "engag[ing] in inappropriate behavior to obtain personal agenda" and stated that he "will do whatever it takes at any cost to get what he wants."  (Doc. 90-1 at 62, 64).  It appears that Lee was kept in a suicide cell or the restrictive housing unit for approximately three weeks.  (Id. at 2; Doc. 144-1 at 8).

(Doc. 64 at 32).[13]

> May 6, 2016, stating:
>
> Captain Knight the lights in 2 cell are all broken out
> and I've told you that even with my glasses I can't see
> at night because it so dark and these guys in here that
> I'm [] with from Elmore you need to move one of us cause
> it's a lot of [] in here and I ain't trying to get hurt
> or have to hurt them!  This my 3rd request to you.

(Doc. 64 at 30) (The submitted request slip is illegible in portions and cannot be deciphered by the undersigned.  The unreadable words are represented by the brackets in the above quotation).

In response to Defendants' position that Lee failed to provide the names of his assailants (White and Pritchard) prior to the attack, Lee argues that: (1) Pooh Man was linked to or associated with Inmates White and Pritchard (and the other assailants) and (2) that he did identify Bobby White to Defendant Warden Peters. Lee describes the inmates, including Bobby White, who "hung out" with Pooh Man as Birmingham, Alabama "gang members" who got "high every day" and claims they threatened to stab Lee in the face. (Doc. 144-1 at 15).  He submits an August 28, 2016 letter that he contends he wrote to Warden Peters, stating:

> I write this request to you seeking your assistance

---

[13] Plaintiff Lee contends that Ms. Hinds made multiple comments to him that because he was incarcerated for murdering his wife, he did not need to be transferred to a minimum-security facility where he would be allowed to work outside the facility and further stated Lee's "current wife was so stupid to marry [him]" and instructed him to leave her office.  (Doc. 64 at 22-23, 25, 29).

hoping that you save someone life whether it be mine or
the guys that I've complained several times to my
classification officer Ms. Hinds about but she won't
help me because she says the Captain Smiley at Elmore
won't call her back to verify my lies!! She says I'm
just making up lies to try to transfer. I've even gone
to Captain Bishop & Knight but none of yall will do yalls
job. My wife and mom collectively have called up here
some 30 times in the past month about this situation
because I've been approved to be married in (2) weeks
(Sept 12) and they don't want me to be hurt by these
guys, or me to have to get married. Everytime they call
now they're just put on hold until they wait a hour then
hang up call back and the same thing. I'm tired of being
threatened by Bobby White saying he will stab me in my
face so if need be I'll get him first, because I haven't
said, nor done, anything to this guy! He hangs out with
his lilhomeboys from B'ham that robbed and assaulted me
@ Elmore but now all of us are here @ Fountain how I
don't know! My wife has retained an attorney to try to
get me moved before I hurt someone defending myself, or
they hurt me. I've even filed a motion with my judge to
get court ordered a program to try to get away from these
guys because yall won't do shit to protect me! I'm now
eligible for transfer and Ms. Hinds is refusing to
transfer me! Please move me from around these guys
before it go down!!

(Doc. 64 at 17). Lee has also submitted an Inmate Request Slip

that was purportedly presented to Warden Peterson on September 20,

2016. The slip states:

I have spoken to you, Ms. Hinds, Captain Knight, and
Captain Bishop about these guys that are here that robbed
and assaulted me at Elmore but nobody will do anything!
If I have to defend myself and kill them or they hurt
me, then what you gone do? Please transfer me, I feel
like my life is on the line or get I&I in here, so I can
get them to lock me up for safety! This is my 2nd request
too you Warden!

(Doc. 64 at 16)(alterations in capitalization). Warden Peters'

signature appears at the bottom of the Inmate Request Slip with a

handwritten note that "I&I was notified." (Id.).  The August 28, 2006 letter also possesses a note and signature of "Warden Peters" at the bottom of the correspondence, which Lee offers as support of Defendants' subjective knowledge of the risk of harm he faced. Warden Peters, however, denies that he signed the letter which describes the threats of harm made by Inmate White and asserts that the documents have been forged.  (Doc. 139-1 at 1-2).  Warden Peters opines:

> the letter the signature is on is not the same letter that I responded to from inmate Lee, nor is it about the same thing.  Someone has forged the letter by taking my response and signature from [a] previous request by Lee and Xeroxed it on the bottom of this letter.

(Doc. 139-1 at 1-2).  Warden Peters further affirms that he "never responded to" nor does he "recall seeing the letter presented by Lee in his Motion for Summary Judgment" and declares the letter to be a "forgery."  (Id. at 2).  In response, Lee maintains that "Peters actually did sign [the letter] after being notified of the enemies and threats made against Lee" and argues he lacks access to a Xerox machine or the ability to make copies of documents on his own.  (Doc. 150 at 2-3).  In support of his position, Lee attaches a letter from Administration Classification Officer Mrs. Mims describing the procedure for obtaining copies of documents, namely that copies are made through the business office for a fee of fifty cents per page.  (Id. at 5).

The law is clear that, "an official may not escape liability

merely by showing that he did not know the claimant was likely to be assaulted or that an assault would be committed by the specific prisoner who eventually committed the assault," Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995)(citing Farmer, 511 U.S. at 843); however, vague allegations of "problems" with another inmate are insufficient to establish that defendant officers were aware of a specific risk of serious harm.  McBride v. Rivers, 170 Fed. Appx. 648, 655 (11th Cir. 2006).  In their motion for summary judgment, Defendants contend that the threats relayed by Lee were insufficient to "impute actual knowledge of a substantial risk of serious harm." (Doc. 144 at 11)(citing Woodyard v. Ala. Dep't of Corrs., 700 Fed. Appx. 927, 933 (11th Cir. 2017).  Relying on Woodyard, Defendants note that Lee himself described the threats "as idle" and reason that because 19 of Lee's reported 20 threats (over a span of 10 months) "did not come to fruition," "the officials had no reason to believe that the threats were credible, because they were not acted upon."  (Doc. 144 at 12).

In Woodyard, the plaintiff inmate reported to a prison official that another inmate threatened to stab him and went "nuttio" (while drunk).  Id. at 932.  The plaintiff told the official that he believed the threat was sincere and that he "feared life-threatening violence." Id.  The defendant officer did not let the plaintiff report the threat to a supervisor, nor did the official report the threat to a supervisor or take other

action.  Id.  The plaintiff was subsequently attacked by the inmate
that threatened him.  The Eleventh Circuit (upholding the district
court's granting of summary judgment based on qualified immunity)
reasoned that because the two inmates had not had any history of
altercations, and there were no reports of widespread violence in
the dorm, the official's response to the situation did not rise to
the level of a constitution violation.  The Court determined,
"[u]ntil binding precedent clarifies the circumstances in which
threats between inmates are sufficient to allow the jury to impute
knowledge of such risks to an officer, we cannot say that in the
circumstances of this case a refusal to act on a threat (or threats
accompanied by drunkenness) amounted to a clearly established
constitutional violation."  Id. at 933.

Arguing that his notifications were sufficient to impute
knowledge of a risk to Defendants, Plaintiff Lee cites Rodriguez
v. Secretary for the Dep't of Corrs., 508 F.3d 611 (11th Cir.
2007).  In Rodriguez, an inmate informed several guards that he
had been threatened by his former gang and that he feared they
would kill him when he was released into the general population.
Rodriguez was released anyway and stabbed within a few hours.  The
Eleventh Circuit determined that a reasonable jury could find that
the defendant officers were aware that Rodriguez faced a
substantial risk of serious harm from his former gang members after
renouncing his membership because Rodriguez relayed the threats to

several officers (to overcome summary judgment).  Id. at 618-22.

The Eleventh Circuit, in Marbury v. Warden, 936 F.3d 1227, 1236-37 (11th Cir. 2019),[14] has recently addressed the disparity between such holdings - that is, when is a communicated threat to an officer sufficient to impute knowledge of a risk of harm to an inmate?  The Court explained:

> Successful deliberate-indifference claims will generally require some further reason — beyond the plaintiff having informed the defendant officers of the threat — that a prison official could have concluded that a particular threat evidenced a substantial threat, rather than the mere possibility, of serious harm.

Marbury, 936 F.3d at 1236.  Accordingly, to establish deliberate indifference to a substantial risk of serious harm, a plaintiff must show that he "gave prison officials further information enabling them to conclude that the risk was substantial and not merely possible."  Id.; see also Harrison v. Culliver, 746 F.3d 1288, 1298 (11th Cir. 2014) ("Only '[a] prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth Amendment.' Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).'").

Taking Defendants version of the facts as true, Lee has failed

---

[14] In Marbury, a per curium decision, the Eleventh Circuit analyzed "whether a reasonable jury could find Marbury's statement that he had heard from a friend that an unnamed prisoner intended to hurt him, and that he was afraid of being hurt or killed, without any further details, sufficient to make the defendants aware of a substantial risk of serious harm." Marbury, 936 F.3d at 1236.

to identify the name of a potential assailant or provide sufficient details that prison officials could have understood that Lee faced a substantial risk of serious harm (like <u>Woodyard</u>).[15]   Taking Plaintiff's version of the facts as true, Lee told numerous officers of a fear for his safety multiple times and (unlike <u>Woodyard</u>) provided details surrounding the threats such that a prison official could have concluded the threat evidenced a substantial risk of serious harm and not a mere possibility, including information that inmate White and others were close associates of Pooh Man, an inmate who had attacked him at another

---

[15] "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." <u>Hale</u>, 50 F.3d at 1583 (quoting *Farmer*, 511 U.S. at 842); <u>see</u> <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990)(Plaintiff must show "a strong likelihood, rather than a mere possibility [of harm] before a guard's failure to act can constitute deliberate indifference.") (internal quotation marks omitted); <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349 (11th Cir. 2003)("[B]efore a defendant's awareness rises to a sufficient level of culpability, there must be much more than mere awareness of an inmate's generally problematic nature."); <u>Chatham v. Adcock</u>, 334 Fed. Appx. 281, 293-94 (11th Cir. 2009)(*per curiam*) (No subjective knowledge or deliberate indifference shown where plaintiff failed to identify a specific "serious threat" reported to defendant officers, despite claims that he was repeatedly threatened prior to being assaulted.); <u>Lavender v. Kearney</u>*,* 206 Fed. Appx. 860, 863-64 (11th Cir. 2006)("General knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference."); <u>Prater v. Dahm</u>, 89 F.3d 538 (8th Cir.1996) (Plaintiff did not allege facts from which an inference of substantial harm could be made; plaintiff alleged only that fellow inmate had made threats against him.).

facility, that inmate White and others were part of a "gang" that did drugs together,[16] that he believed they targeted him because

---

[16] In his deposition, Lee attempts to describe the threats made against him and the situation surrounding the same. He opines that he was targeted from the beginning because "[he] told on [their] homeboy at Elmore." (Doc. 144-1 at 13). Lee claims the inmates threatened him, "nearly every day" but he alleges most days:

> I would hear them and I wouldn't even - - I just kept going because I slept with a knife at all times. I mean, they were right there, like I say, gang members, getting high every day. I don't do drugs. I'm not in a gang. I'm down here by myself. Like I say, I had told the prison officials, but none of them would listen. So by any means, I'm going to protect myself in there.

(Id. at 15). Conversely, Defendants assert that Lee was attacked and robbed to obtain a contraband cellphone. (Doc. 46-1 at 2). Lee blatantly denies "admitting to the investigating officer or any officer that the altercation resulted from inmates Pritchard and White attempting to rob him of his contraband cellphone, because Lee never owned, nor possessed a cellphone." (Doc. 64 at 3)(internal quotation marks omitted and alterations in capitalization). Lee affirms:

> The only time something came up about a cellphone was on the ambulance. Officer Tracey Idler kept asking what they rob you for and because I'd lost so much blood and was so cold and tired I couldn't talk to him. "I bet it was one of them $700.00 cellphones wasn't it [,"] he kept saying. He continued to press me for a answer until the ambulance attendant told him to not make me talk because there was gauze in and taped all around my mouth where the knife had gone in and through my lips into my mouth on both the left and right side. The investigator at the hospital ask the same question and I couldn't talk because I'd been shot up with Novacaine to numb my mouth to be stitched up. I was given a disciplinary for possession of a phone. The hearing officer asked the investigating officer 'did I tell him they were trying to rob me for a phone?' He stated No, upon his investigation several confidential informants "informed" him that's what they were allegedly after. I was found not guilty . . . At no time did I ever possess a phone at FCC to be robbed for.

he had complained about their "home boy" Pooh man, and that the threats escalated from demands for money to threats to stab him. (Doc. 144-1 at 15). The record before the court does not clearly refute either parties' version of the facts.[17] Thus, there remain genuine issues of material facts and credibility determinations as to whether or not Defendants were aware of a substantial risk of serious harm based on Lee's alleged notifications to them. At this stage of the action, it is not the function of the reviewing court to weigh the evidence and determine the truth of the matter; rather, it is to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 252; Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co., 802 F.2d 1352, 1356 (11th Cir. 1986) ("[T]he court may not weigh conflicting evidence to resolve disputed

---

(Doc. 64 at 21). Instead, it is Lee's "personal opinion" that the purpose of the incident was to steal Lee's property for drugs, stating:

> I honestly don't know what it was for because like I say, the guy Pooh Man was at Elmore. He robbed me over there, put a knife in me there. He ends up at Fountain with me, hangs out with these guys in my dorm, and poof, here we are today.
> So I don't know how it snowballed or came into effect, but in a nutshell, I think it was all behind, you know, drugs. . . .

(Id. at 19).

[17] The undersigned observes, in passing, that at this juncture of the case, the Court cannot make credibility determinations. However, the submission of forged documents, if proven, will not be tolerated because it constitutes fraud on the Court and carries serious consequences.

factual issues; if a genuine dispute is found, summary judgment must be denied.")); Kingsland v. City of Miami, 382 F.3d 1220, 1227 (11th Cir. 2004), cert. denied, De Armas v. Kingsland, 543 U.S. 919, 125 S. Ct. 80, 160 L. Ed. 2d 203 ("The plaintiff's word is merely countered by the defendants' testimony. Given the standard of review at the summary judgment state, we must accept [Plaintiff's] version of the facts as true.") (citing Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002)).

Accordingly, the parties have presented evidence of a factual dispute that may only be determined by a trier of fact.

**2. Reasonable response to risk of harm.**

If Lee is able to show that Defendants had knowledge of a substantial risk of serious harm, he must then establish Defendants failed to respond to the risk in a reasonable way. Cottone v. Jenne, 326 F.3d 1352, 1358 (11th Cir. 2003)(A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk."); see also Farmer, 511 U.S. at 844-45 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). State another way, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 845; see

also Hale v. Tallapoosa Cnty., 50 F.3d 1579, 1583 (11th Cir. 1995)
(An official responds to a known risk in an objectively
unreasonable manner if "he knew of ways to reduce the harm but
knowingly declined to act" or if "he knew of ways to reduce the
harm but recklessly declined to act."). Furthermore, "[e]ach
individual Defendant must be judged separately and on the basis of
what that person [knew at the time of the incident.]". Burnette
v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008). Thus, to be
successful on his deliberate indifference claim, Plaintiff Lee
bears the burden of establishing that each named Defendant failed
to act in a reasonable manner to his communicated threats of harm.
Conversely, each Defendant bears the burden of showing he or she
reasonably responded to the communicated risk of harm.

It is clear from the record that Lee had one confirmed enemy
from the Elmore Correctional Facility, Jamerious M. Taylor. (Doc.
46-8). The prison records further confirm the incident between
Inmate Taylor and Lee involved robbery and assault at Elmore, as
alleged by Lee. (Id.). It is unclear from the record before the
Court, however, whether or not Defendants investigated whether or
not Jamerious Taylor was incarcerated at Fountain at the same time
as Plaintiff, specifically whether Jamerious Taylor was also known
as "Pooh Man" or whether Pooh Man's bed number was assigned to
Inmate Taylor. It is also unclear from the record which, if any,
Defendants contacted Elmore to investigate Lee's claims. The

26

affidavits put forth by Defendants are void of direct responses to
Lee's claims against them (including whether or not Lee notified
them of Pooh Man, any link to Pooh Man and the ultimate assailants,
or any details regarding complaints of fear or threats made by Lee
to them).  Instead, Defendants affirm:

> Inmate Lee does not have any known enemies at Fountain
> Correctional Facility.  (Docs. 46-3).

> Mr. Lee made no attempt prior to the October 27, 2016
> incident to have inmates Pritchard or White added to his
> enemy list.  (Docs. 46-2; 46-3; 46-4).

> Mr. Lee never identified inmates Pritchard and/or White
> as inmates he feared.  (Docs. 46-1; 46-2; 46-4).

Furthermore, while Lee broadly asserts he notified all
Defendants of threats made against him, the documentary evidence
Lee has put forth suggests that only Warden Peters received written
notification of alleged threats by Inmate Bobby White.
Accordingly, based on the record before the Court and the facts as
laid out above, there remain material questions of fact as to what
each Defendant knew and how he or she responded.

### 3. Cause of Injury.

Last, Lee bears the burden of establishing that Defendants'
failure to act caused the October 27, 2016 attack.  As previously
discussed, there remain genuine issues of material fact related to
Plaintiff's claim.  As such, it cannot yet be determined whether
or not Defendants may be held liable for causing injury to Lee.
Accordingly, the undersigned determines that it is premature (and

impossible) to evaluate this prong for establishing deliberate indifference.

## IV.  Conclusion.

Based upon the foregoing reasons, summary judgment must be **DENIED** at this time as to Plaintiff Rashad Lee and Defendants Kenneth Peters, Kevin Bishop, Willie Knight, and Sandra Hinds.

<u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.  *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. Ala. Gen.LR 72(c).  The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.  In order to be specific, an objection must identify the specific

finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **7th** day of **February, 2020.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**